IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-02300-DDD-SBP

RUBESNE RESOURCES LLC, a Colorado Limited Liability Company,

    Plaintiff,

v.

ACE PROPERTY AND CASUALTY INSURANCE COMPANY, a Foreign Corporation,

    Defendant.

---

### ORDER ON DEFENDANT'S MOTION TO COMPEL

---

**Susan Prose, United States Magistrate Judge**

This matter comes before the court on a motion to compel filed by defendant ACE Property and Casualty Insurance Company ("ACE"). ECF No. 56. The motion has been referred to the undersigned United States Magistrate Judge for resolution pursuant to 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a). ECF No. 58. Following a careful consideration of the briefing on the motion, the entire docket, and the applicable law, the court respectfully **ORDERS** that the motion is **GRANTED in part**, with ACE's request for spoliation sanctions to be renewed, if appropriate, following the forensic examination of a cellular phone as ordered herein.

### BACKGROUND

**I.      ACE's Prelitigation Investigation of a Fire on Plaintiff's Property**

The impetus for this action is a devastating fire in Englewood, Colorado, that destroyed a retail store called "Kid to Kid," operated by plaintiff Rubesne Resources LLC ("Rubesne"). First

Amended Complaint, ECF No. 20 ¶¶ 12-13; ECF No. 56-4 at 2 (February 15, 2024 Golden

Forensics Technical Report by Rick Baldwin, CFI[1]). A business owners' insurance policy issued

by ACE (the "Policy") was in effect at the time of the fire. ECF No. 56 at 5 ¶¶ 2-3; ECF No. 56-

2 (Policy excerpts). Rubesne made a claim under the Policy. ECF No. 20 ¶ 27. According to

ACE, in its investigation following the submission of Rubesne's claim, it obtained information

from multiple sources indicating the fire was deliberately set. To fully address the dispute

between the parties at this stage of the proceedings, the court recounts in some detail the history

of this case, commencing with events that occurred in the course of ACE's prelitigation

investigation of the fire.

The fire was reported to South Metro Fire Rescue on January 5, 2024, at 11:58 p.m. ECF

No. 56 at 5 ¶ 5; ECF No. 56-3 (South Metro Fire Rescue Incident Report reflecting a print date

of February 1, 2024). The report generated by the fire department states that an "Incendiary

device" was located on scene and that the "Cause of Ignition" was "Intentional." ECF No. 56-3

at 6. ACE then retained a cause-and-origin expert, who concluded that the cause of the fire was

"incendiary"—that is "[a] fire that is intentionally ignited in an area or under circumstances

where and when there should not be a fire." *Id.* at 17 n.6. The cause-and-origin expert opined, "to

a reasonable degree of scientific certainty," that "[t]here were multiple areas of origin on the

countertop containing the cashier positions, the floor where the cashiers stood, the floor in front

of the cashier positions, and in two of the aisles containing clothing," and that "[t]he cause of the

fire was incendiary with a person or persons entering the front of the store, probably using a key.

They then poured gasoline in these described areas and ignited them with an open flame,

---

[1] The court understands "CFI" to refer to a "Certified Fire Investigator."

probably from a lighter." *Id.*

As part of its investigation of the claim, ACE also retained a financial advisory firm to evaluate the financial condition of Rubesne at the time of the fire. ECF No. 56 at 6 ¶ 13; ECF No. 56-6 (July 19, 2024 report by Baker Tilly Advisory Group, LP). The firm concluded that Rubesne's financial condition before the fire was "poor":

> Based on the review of the documentation we received and reviewed, we observe that [Rubesne's] reported operating expenses greatly exceeded its revenues from the inception of operations through the date of the fire on January 5, 2024. The financial documents appear to indicate that not all of the business' expenses were paid in the period prior to the fire (rent, interest/loan payments, payroll taxes, etc.). If those expenses were incurred and paid, there would be an even greater shortfall between revenues and expenses. The business required significant outside sources of capital (besides the sales of the business) in order to pay its ongoing operating expenses. Based on the estimated startup costs, the reported expenses of the business during the "ready-to-buy period", and the net losses incurred from March 2023 through December 2023, it would appear that all of the funds from the financing available to [Rubesne] would have been exhausted by the date of the fire. For all the reasons highlighted above, the financial condition of [Rubesne] was poor as of the date of the fire on January 5, 2024. [Rubesne's] ability to continue as a going concern was likely in jeopardy and its existence beyond the short-term was questionable.

*Id.* at 3; *see also id.* at 4 (concluding that Rubesne "operated at a large net loss during the year prior to the fire and the continuing operating expenses of the business, if any, would not be expected to exceed the projected loss of the business during the period of closure"). On January 4, 2024—the day before the fire—attorneys for KeyBank National Association sent a letter to Karen Rubesne, the manager and "100% owner" of Rubesne, ECF No. 56 at 5 ¶ 7, informing her that Rubesne was in default on a $382,000 loan she had personally guaranteed and that the entire outstanding balance had been accelerated and was immediately due and payable. ECF No. 56-14

3

(excerpt from January 4, 2024 letter from Brown Dunning Walker Fein Drusch PC to Karen A. Rubesne and others re: Loan Obligation of Rubesne Resources, LLC).

Also in connection with its investigation of Rubesne's claim under the Policy, ACE sought information from three individuals directly involved in the operation of Rubesne: (1) Ms. Rubesne; (2) Amber McCurdy, Rubesne's operations manager and Ms. Rubesne's daughter; and (3) Anthony Casados, an employee of Rubesne who was at that time Ms. McCurdy's fiancé. ECF No. 56 at 5-6 ¶¶ 7-8. Throughout the claim-investigation process, Ms. Rubesne and Ms. McCurdy were represented by the same counsel who represents Rubesne in this litigation. *Id.* at 5-6 ¶¶ 4, 12.

During that prelitigation investigation, counsel for Rubesne produced call and text logs for the period from December 1, 2023, through January 6, 2024, which showed numerous text messages between Ms. Rubesne and Ms. McCurdy, and one between Ms. Rubesne and Mr. Casados, immediately before and after the fire was reported at 11:58 p.m. on January 5, 2024. Specifically, between 10:58 p.m. on January 5, 2024, and 12:14 a.m. on January 6, 2024—sixty minutes before and sixteen minutes after the reported start time of the fire—Ms. Rubesne exchanged fifteen text messages with Ms. McCurdy. *Id.* at 6-7, ¶¶ 13-14. Ms. Rubesne sent one text to Mr. Casados at 12:14 a.m. *Id.* at 7, ¶ 14. The court refers to these sixteen text messages as the "Missing Texts."

ACE represents that the Missing Texts have never been produced or accounted for on a privilege log. *Id.* at 7, ¶ 15. Rubesne's privilege log does list texts exchanged on January 5, 2024,[2] just not for the timeframe during which the Missing Texts were transmitted:

---

[2] No texts are logged for January 6, 2024. *See* ECF No. 56-12 (August 27, 2025 Privilege Log).

**January 5, 2024**:

Texts: 7:05:07 a.m.; 7:09:55 a.m.; 7:56:07 a.m.; 1:57:49 p.m.; 3:25:44 p.m.; 3:26:00 p.m.; 3:26:43 p.m.; 3:26:54 p.m.; 3:27:15 p.m.; 3:28:34 p.m.; 3:28:53 p.m.; 3:29:41 p.m.; 3:30:13 p.m.; 3:30:24 p.m.; 3:30:42 p.m.; 3:33:45 p.m.; 3:34:22 p.m.; 3:34:41 p.m.; 3:34:52 p.m.; 3:34:58 p.m.; 3:35:53 p.m.; 3:36:32 p.m.; 3:36:57 p.m.; 3:37:20 p.m.; 3:42:04 p.m.; 5:52:58 p.m.; 6:37:32 p.m.

Social media messages: 11:46:18 p.m. (two messages).

*See generally* ECF No. 56-12 In other words, none of the messages known to have been transmitted between 10:58 p.m. on January 5, 2024, and 12:14 a.m. on January 6, 2024, as evidenced on the message log produced by Rubesne, are accounted for on its privilege log.

During an "Examination Under Oath" in connection with the claim-investigation process, Ms. Rubesne initially denied that she had texted with anyone during the evening of January 5, 2024. ECF No. 56 at 7 ¶ 16; ECF No. 56-8 at 143:10-11 (excerpt from June 14, 2024 Examination Under Oath of Karen A. Rubesne). Only when confronted with the log showing the Missing Texts did Ms. Rubesne assert that she had been texting with Ms. McCurdy during that time and that the subject of their conversation was the weather and its impact on the store. ECF No. 56-8 at 146:2-6, 149:1-7. Contradictorily, Ms. McCurdy testified during the claim-investigation process that the Missing Texts concerned a recent medical diagnosis received by Ms. Rubesne. ECF No. 56-9 at 98:9-13 (excerpt from June 14, 2024 Examination Under Oath of Amber McCurdy) ("She asked me if I was okay and if I was upset that she didn't tell me the first time that she had been diagnosed and she was explaining why she didn't tell me then."); *id.* at 98:17-20 (averring that McCurdy and Rubesne had seventeen "back and forths" on the topic of Rubesne's medical issues). At the time of their Examinations Under Oath, counsel for ACE

5

asked Ms. Rubesne and Ms. McCurdy to preserve their cell phone data, and they agreed to do so. ECF No. 56 at 8 ¶ 18.

Although the Missing Texts have never come to light, Rubesne did eventually produce some texts, including a handful of texts between Ms. McCurdy and Mr. Casados retrieved from Mr. Casados's cell phone. *See* ECF No. 56-13. As pertinent to the timeframe at issue here, Ms. McCurdy texted a single word—"Dammit"—to Mr. Casados at 10:56 p.m. on January 5, 2024. *Id.* at 2. And on January 6, 2024, at 10:16 p.m.—approximately twenty-three hours after the fire started—Mr. Casados wrote: "Hey, *I just found one of the torches*," eliciting a reply of "Yay!" from Ms. McCurdy. *Id.* at 5 (emphasis added).

## II.      The Instant Litigation and ACE's Motion to Compel

Rubesne initiated this lawsuit in Denver District Court on July 26, 2024, raising claims against ACE for breach of contract and statutory bad faith under Colorado Revised Statutes §§ 10-3-1115 and 10-3-1116. ECF No. 3 ¶¶ 34-44. On October 16, 2024, ACE issued a "coverage position" letter denying coverage on multiple grounds, including pursuant to the Policy's dishonesty and fraud exclusions. *See* Scheduling Order, ECF No. 22 at 3-4. In that letter, Ms. Rubesne was informed that, following its investigation, ACE had reached the following conclusion:

> The investigation revealed that the January 5, 2024 fire was intentionally caused by someone; the only motive ever identified is the financial motive of Rubesne Resources, LLC. Further, there is significant unexplained circumstantial evidence implicating you and your manager based upon the concealment of communications in the hours surrounding the fire and the lack of forced entry into the building. ACE has determined that the intentionally set fire was caused by or procured by you or one of your employees. Colorado has a public policy against providing insurance coverage to an insured for the result of the insured's wrongful or criminals acts.

ECF No. 61-2 at 4 (October 16, 2024 letter from Ephraim Hilliard to Karen Rubesne).

On February 20, 2025, ACE served written discovery requests on Rubesne, including the following request for production:

> Please produce copies of all text messages, instant messages, e-mail communications, voice mail messages, social media posts, or any other electronic form of communication, sent or received or made by **YOUR** representative Karen Rubesne, at any time from December 1, 2023, at 12:00 a.m., to January 7, 2024, at 12:00 a.m., including any related attachments or media, from any mobile device, phone number, or messaging application, that relate in any way to the **POLICY**, the **INCIDENT**, the **CLAIM**, the **PREMISES**, the **LEASE**, and/or the **NOTE**.

Request for Production No. 13, ECF No. 56-10 at 3. Rubesne objected to this request on privacy and relevance grounds, but produced some texts and Facebook messages, which ACE accurately describes as "heavily redacted." ECF No. 56 at 8 ¶ 23; ECF No. 56-11 (reflecting redactions on 48 of 79 pages of messages, with numerous full-page redactions, and obliterating the date, time, sender/recipient, and subject of the texts). As previously noted, the Missing Texts were not produced, nor are they reflected on Rubesne's privilege log. *See generally* ECF No. 56-12. The privilege log, however, does show that Rubesne has withheld, on the basis of "certain privileges of the Plaintiff and its representative," two "Social Media Messages" that were exchanged at almost the precise time the fire is estimated to have commenced. *See id.* at 2 (withholding messages exchanged between Dominique Ablez and Karen Campbell[3] dated 1/5/2024 at 11:46:18 p.m.).

On July 3, 2025, following Rubesne's refusal to make a full response to ACE's request

---

[3] The unredacted messages produced by Rubesne indicate that "Karen Campbell" is the name Karen Rubesne used on Facebook. *See* ECF No. 56-11 at 8 (referencing "Karen Campbell (owner)" as having posted messages on Facebook beginning at 2:38 a.m. on January 6, 2024).

for text and social media messages, the court conducted a discovery dispute conference. *See*

Courtroom Minutes, ECF No. 50. At that conference, counsel for Rubesne stated that a forensic

examiner had extracted all available text messages from Ms. Rubesne's cellular phone, revealing

that some text messages were gone and could not be retrieved:

> [T]he phone still maintains some text messages that correlate with the logs, and ***there's some messages that are no longer on the phone***.

> So we have some within the hours that have nothing to do with the subject matter that's being requested, and then there's various other times based upon the call logs and message logs where there aren't messages there.

> And so we've produced what we have, what we could find, what we could get out of this phone, an older phone that, again, we have it.

ECF No. 51 at 44:1-10 (July 3, 2025 Hearing Transcript) (emphasis added); *id.* at 44:17-22

(confirming that there had been a forensic analysis of the phone). This was news to ACE's

counsel, who said they were unaware that any forensic analysis of the device had occurred. *Id.* at

46:2-5. As counsel for ACE put it at the conference, if Rubesne's counsel "has had that phone

altered in some way through a forensic examination that could have been destructive and has not

told us, that raises up all kinds of questions." *Id.* at 45:19-22. Notably, Rubesne has not identified

the individual who performed that forensic examination and, according to ACE, "it remains

unknown what processes were used or if there were any attempts to recover data from alternative

sources such as cloud storage." ECF No. 56 at 10 ¶ 31; *see also* ECF No. 51 at 46:25-47:3

(counsel for ACE expressing "serious concerns that these text messages that we think could be

highly relevant have been destroyed").

After learning of the undisclosed forensic examination of the Ms. Rubesne's cell phone—

and that some sixteen texts covering the exact moments leading up to and following the ignition point of the fire were acknowledged by counsel to have gone missing—the court ordered Rubesne to "ensure that no electronic communication records or devices be altered or destroyed." ECF No. 50. The instant Motion followed.[4] In it, ACE seeks an order compelling Rubesne to produce Ms. Rubesne's cell phone for a forensic examination by an expert identified and retained by ACE, along with unredacted versions of the texts that have already been downloaded. *See* ECF No. 56 at 10-12, 15. ACE finally asserts that, "in light of the known existence of the above-detailed [Missing Texts], ACE needs further relief" in the form of spoliation sanctions: "at minimum, an adverse jury instruction on the content of the messages as implicating Plaintiff's representatives in causation of the subject fire—if not outright dismissal of this case." *Id.* at 15, 17. Rubesne counters that the disputed text messages are irrelevant; that Rubesne and Ms. Rubesne, its principal, have a legitimate expectation of privacy in their personal communications; that a forensic examination of Ms. Rubesne's personal cell phone would be unduly intrusive; and that sanctions are not warranted. *See* ECF No. 61 at 6-13.

The court addresses the parties' arguments and concludes that ACE's arguments carry the day.

## DISCUSSION

### I.    Forensic Examination of Ms. Rubesne's Cellular Phone

#### A.    Legal Analysis

ACE's principal request in the Motion to Compel is that the court order a forensic

---

[4] Rubesne has also filed a motion to compel, ECF No. 57, which the court will address by separate order.

examination of Ms. Rubesne's cell phone by an expert to be identified and retained by ACE, who would be tasked with creating a mirror image of the device in order to attempt to recover any deleted social media and text messages within the circumscribed timeframe of December 1, 2023, to January 7, 2024, and to identify any deletion activity concerning this narrow group of texts. ECF No. 56 at 10-12; ECF No. 65 at 7-8.

To begin with the governing legal principles, "[w]hen determining whether to grant a motion to compel the forensic imaging of a cell phone or other electronic device, courts have considered whether the examination will reveal information that is relevant to the claims and defenses in the pending matter and whether such an examination is proportional to the needs of the case given the cell phone owner's compelling privacy interest in the contents of his or her cell phone." *Hardy v. UPS Ground Freight, Inc.*, No. 3:17-CV-30162-MGM, 2019 WL 3290346, at *2 (D. Mass. July 22, 2019). The court may compel a forensic examination of a personal device when the moving party demonstrates that the opposing party has concealed information or lacks the expertise necessary to search and retrieve all relevant data. *Belcastro v. United Airlines, Inc.*, No. 17 C 1682, 2019 WL 7049914, at *2 (N.D. Ill. Dec. 23, 2019). "Further, before permitting an intrusion into an opposing party's information system—particularly where that party has undertaken its own search and forensic analysis and has sworn to its accuracy[5]—the inquiring party must present at least some reliable information that the opposing party's representations are misleading or substantively inaccurate." *Pable v. Chicago Transit Auth.*, No. 19 CV 7868, 2021 WL 4789023, at *2 (N.D. Ill. Apr. 2, 2021) (citing *Williams v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 144, 146 (D. Mass. 2005)).

---

[5] Here, Rubesne has not "sworn to [the] accuracy" of its examiner's analysis.

The court finds that ACE has come forward with sufficient reliable information indicating that Rubesne's representations concerning the Missing Texts are misleading, if not inaccurate, and that the nebulous circumstances surrounding Rubesne's own forensic examination call into question whether all avenues have been exhausted to search and retrieve potentially available information from Ms. Rubesne's cellular phone for examination. Additionally, the court concludes that no other legal barrier precludes the issuance of an order directing Rubesne to produce the device. In so finding, the court emphasizes four key points.

*First*, and fundamentally, it cannot reasonably be disputed that the Missing Texts could be critically relevant to ACE's ability to defend against Rubesne's allegations that ACE breached the terms of the Policy and acted in bad faith. This middle-of-the-night texting nearly precisely coincides with the ignition time of the fire, per the report of South Metro Fire Rescue, and the inconsistent statements about the subject of the texts by Ms. Rubesne and her daughter give the court reason to question the veracity of both descriptions. Moreover, Rubesne's contention that Ms. Rubesne "deleted messages from her phone as a way to clear space," ECF No. 61 at 8, rings somewhat hollow when viewed in the broader context of the available evidence, which shows that Ms. Rubesne did *not* delete twenty-seven other texts exchanged earlier on January 5, 2024, the last of which was sent at 6:37:32 p.m. *See* ECF No. 56-12 at 48. Nor did she "clear" her phone of approximately **170** messages and texts exchanged with others on January 6, 2024. *See* ECF No. 56-11. The court does not know why Ms. Rubesne selected for deletion the texts disseminated between 10:58 p.m. and 12:14 a.m. on the night of the fire, but that choice strongly suggests she was aware that information detrimental to her or her business might be drawn from the Missing Texts. With all due respect to Rubesne, the proclamation that the Missing Texts

11

should be disregarded as wholly lacking in relevance cannot reasonably be squared with the record.

In light of the overall factual context reasonably discerned from the available record, it is entirely rational to conclude that, given their timing, the Missing Texts—and the messaging that preceded them in the last weeks of 2023—could go straight to the heart of matter. The court therefore is unable to take Rubesne at its word that the Missing Texts bear no relevance to ACE's defenses or to countenance its characterization of a forensic examination as "more like a fishing expedition than a legitimate discovery effort." ECF No. 61 at 8. Given the circumstances here, a forensic examination cannot be dismissed as "[a] mere desire to check that the opposition has been forthright in its discovery responses." *See Pipeline Prods., Inc. v. Madison Cos., LLC*, No. 15-4890-KHV, 2018 WL 4826205, at *2 (D. Kan. Oct. 4, 2018) (finding that this was "not a good enough reason for a court order compelling computer forensic examination"). Instead, such an examination represents the only possible means to retrieve critically relevant information that Rubesne acknowledges disappeared as a result of Ms. Rubesne's "clearing space" on her phone.

***Second***, the first forensic examination completed by Rubesne, concerning which no particulars have been revealed, was undertaken without notice to ACE. Had Rubesne immediately owned up to the Missing Texts, and conferred with ACE before having Ms. Rubesne's phone examined, the instant dispute may have been averted. The parties might have agreed on a neutral third-party forensic expert, as well as the parameters of a forensic examination. As things stand, however, Rubesne has conducted its own forensic examination, but would have the court preclude ACE from conducting a similar analysis—leaving ACE (and the court) to take Rubesne's word for it that there is no other responsive, non-privileged

information to be extracted from Ms. Rubesne's phone. In light of the record described above, the court perceives no justification for countenancing this unequal approach and finds that ACE is entitled to test the integrity of Rubesne's forensic examination by conducting one of its own.

*Third*, the limited scope of the information ACE seeks by way of a second forensic examination emphasizes the reasonableness of its request. ACE asks that the examiner be authorized to search for texts only for the period from December 1, 2023, to January 7, 2024, and to identify information about the deletion of texts—purportedly to "clear space" on the phone, ECF No. 61 at 8—during the same period of time. *See* ECF No. 65 at 8.

*Fourth*, and finally, the undersigned is respectfully unpersuaded by Rubesne's argument that privacy considerations prevent the court from ordering a forensic examination of Ms. Rubesne's cellular phone. *See* ECF No. 61 at 9-11. Under the Federal Rules of Civil Procedure, which govern discovery here, a court has discretion to issue an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," Fed. R. Civ. P. 26(c)(1)—in essence, the relief Rubesne requests in resisting production of the phone. In that regard, "[a]lthough privacy interests . . . are not weighed in the same way privilege claims are weighed, courts have held that where a state doctrine promotes confidentiality and does not conflict with federal interests it may be taken into account as a matter of comity." *Am. Ins. Co. v. Pine Terrace Homeowners Ass'n*, No. 20-cv-00654-DDD-MDB, 2023 WL 6796161, at *2 (D. Colo. Apr. 17, 2023) (citing *Scholl v. Pateder*, No. 09-cv-02959-PAB-KLM, 2011 WL 3704802, at *2 (D. Colo. Aug. 23, 2011); *Gottlieb v. Wiles*, 143 F.R.D. 235, 237 (D. Colo. 1992)).

Upon a review of the applicable law, the court finds that the four-factor balancing test enunciated in *In re District Court, City & Cnty. of Denver*, 256 P.3d 687, 691 (Colo. 2011),

guides the analysis of the confidentiality question. *See Pine Terrace*, 2023 WL 6796161, at *1

(applying *In re District Court* in evaluating whether performance reviews should be produced).

As articulated in *In re District Court*, four factors must ordinarily be satisfied before the court

orders production of confidential materials:

> The party requesting the information must always first prove that the information
> requested is relevant to the subject of the action. Next, the party opposing the
> discovery request must show that it has a legitimate expectation that the requested
> materials or information is confidential and will not be disclosed. If the trial court
> determines that there is a legitimate expectation of privacy in the materials or
> information, the requesting party must prove either that disclosure is required to
> serve a compelling state interest or that there is a compelling need for the
> information. If the requesting party is successful in proving one of these two
> elements, it must then also show that the information is not available from other
> sources. Lastly, if the information is available from other sources, the requesting
> party must prove that it is using the least intrusive means to obtain the information.

*See* 256 P.3d at 691-92.

Applying the *In re District Court* balancing test to the factual record here, the court first

concludes, for the reasons delineated at length above, that the information requested is highly

relevant to the subject of this action.

As to the second factor, the court finds no "legitimate expectation of privacy" in the

content of conversations undertaken by the principal of an insured—notably, one who has been

shown to have been in an extremely precarious financial situation—in the several weeks leading

up to a devastating fire of the insured's premises, including texts with her employees in the

moments closely surrounding the ignition point of the blaze. ACE asserts that Rubesne was

obliged to turn over these documents in connection with ACE's investigation of the claim, ECF

No. 65 at 5 (citing ECF No. 56-2 at 3 ¶ 3a(6)) (listing production of "records" among the

insured's "Duties in The Event Of Loss Or Damage"), and this court can imagine no scenario in

which an insured who has made a claim for hundreds of thousands of dollars under

circumstances of suspected arson could resist turning over communications made in

contemporaneous and near-contemporaneous proximity to the fire. *See Latimore v. Campbell*,

No. 23-cv-00349-DDD-KAS, 2024 WL 4471980, at *2 (D. Colo. May 29, 2024) (in applying the

*In re District Court* test, finding that the defendant had a "compelling need" for phone records

that could show a decedent was rarely in touch with this then-wife and thus undermined her loss-

of-consortium claim); *cf. Clay v. Lambert*, No. 17-cv-00085-PAB-MEH, 2017 WL 4755152, at

*4 (D. Colo. Oct. 20, 2017) (concluding that information concerning specific calls or messages

to particular people was not relevant because the requesting parties' "only argument for the

relevance of the requested information" was that it would "reveal Defendants' location," and it

was obvious that "the specific people Defendants communicated with will not demonstrate their

location").

Regardless, ACE has demonstrated a compelling need for the forensic evaluation of Ms.

Rubesne's cellular phone. It is a matter of common sense that the people with whom Ms.

Rubesne was communicating in near proximity to the time of the fire, and the contents of those

communications, likely have a direct bearing on Rubesne's claim and ACE's defenses in this

litigation. And the reasonable temporal limitation of December 1, 2023, to January 7, 2024,

which ACE has proposed and which this court adopts, prevents the scope of the forensic

examination from intruding into the realms of overbreadth and undue burden.

Lastly, as to the directive in *In re District Court* to consider the availability of

information from other sources, Rubesne urges that ACE should pursue retrieval of the Missing

15

Texts from Ms. McCurdy, Ms. Rubesne's daughter, and Mr. Casados, Ms. McCurdy's then-fiancé. ECF No. 61 at 10. The court finds the contention that this avenue presents a less-intrusive approach somewhat perplexing, given that it would entail the forensic examination of two cellular phones, instead of one. And as the principal of Rubesne, and the individual responsible for its debt, Ms. Rubesne indisputably is the focal point of these shared communications. Too, there is nothing in the record to indicate that cellular phones belonging to Ms. McCurdy and Mr. Casados would contain the entire scope of messages spanning the weeks between December 1, 2023, and January 7, 2024.[6] In these circumstances, an examination of Ms. Rubesne's cell phone is the most feasible, direct option to obtain relevant information, and this court finds no legal justification to compel ACE to embark on a circuitous—and likely fruitless—route to attempt to procure that data.

For these reasons, ACE shall be permitted to conduct a forensic examination of Ms. Rubesne's cellular phone to seek to obtain access to all texts and social media messages, and associated metadata, generated between December 1, 2023, to January 7, 2024.

### B.    Logistics of the Forensic Examination

ACE advocates for unrestricted access to all messages derived from the forensic examination. It asserts that the imposition of any limitations on access is untenable under the circumstances because it is impossible to proactively define what manner of communications

---

[6] ACE states that it has attempted to obtain information from the McCurdy and Casados phones, from which it procured the "torches" message, but that it does not envisage more information can be gotten by those means. *See* ECF No. 56 at 9 n.9 (noting that "ACE has served subpoenas on Ms. McCurdy and Mr. Casados, who since have relocated to Tennessee, to attempt to obtain data from their phones," but that "[t]o date no new data has been provided").

may relate to "opportunity and motive to start the fire." ECF No. 56 at 4. ACE further asserts

that in camera review also "will not suffice because of potential nuances in the communications

that might relate to the fire and related issues such as truthfulness during the [Examinations

Under Oath], which ACE will not be able to determine absent production of the messages." *Id.*

ACE's concerns are legitimate.

The court is unable to conceive of an easily-identifiable list of search terms that would

allow for the segregation of all potentially relevant communications here. As an example of the

limitations and impracticalities associated with attempting to craft such a list, this court would

not necessarily have thought to include the word "torches" among the search terms, ECF No. 56-

13, although the relevance of messages utilizing that word is patently obvious. Furthermore,

Rubesne's own actions have contributed to the conundrum of proactively formulating limitations

on the parameters of the examination. In its privilege log, Rubesne lists fifty-six pages of

messages generated between December 1, 2023, and January *see* ECF No. 56-12, but it does not

assert that any of those messages contain protected work product or information shielded by the

attorney-client privilege. *See id.* at 2. Instead, it declines to produce the messages based on a

claim of "privacy," *id.*, which, as discussed above, the court finds unpersuasive as a basis for

withholding communications within the narrow period to be uncovered by the forensic

examination.

It is unclear what privilege Rubesne means to invoke by referencing *Alcon v. Spicer*, 113

P.3d 735 (Colo. 2005), *see id.*, which held that "[b]y filing a personal injury lawsuit, [a plaintiff]

did not inject her physical condition into the case such that she waived the physician-patient

privilege for her entire medical history." *See* 113 P.3d at 743. Rubesne does not explicitly claim

17

the physician-patient privilege on behalf of Ms. Rubesne. And to the extent the messages that may be unearthed during the forensic examination may discuss a medical condition or diagnosis, Ms. McCurdy testified that her mother's medical diagnosis was the very subject of the Missing Texts. ECF No. 56-9 at 98:9-13. Put simply, medical information that may be referenced in the messages to be extracted in the forensic examination here could bear on the issue of the credibility of both Ms. McCurdy and Ms. Rubesne and their respective motives and intentions during this critical period of time. This court does not intend to allow ACE to probe Ms. Rubesne's "entire medical history," *see Alcon*, 113 P.3d at 743, but it will not preemptively foreclose a forensic extraction of limited information from her cellular phone on the chance that it may reference a medical condition that has been offered as an explanation for communications that occurred at the very time the fire started.

In short, Rubesne has articulated no basis for the court to find that *any* privilege bars the production of social media and text messages during the highly significant period between December 1, 2023, and January 7, 2024, and ACE has met its burden to show that any confidentiality interest is outweighed by its compelling need to review the messages. The court therefore imposes no limitations on the scope of the forensic examination and download of social media and text messages contained on Ms. Rubesne's cellular phone for the stated five-week period. Related to this conclusion, several related points warrant mention.

First, the court appreciates that the ACE examiner must create a mirror image of the entire contents of the cellular device, *see* ECF No. 65 at 8, but that does not compel the conclusion that the examiner must provide the entire contents of the device to ACE, and the court specifically orders that the examiner transmit to ACE *only* messages that fall within the

18

period from December 1, 2023, to January 7, 2024. However, ACE is entitled to retrievable

information showing when messages generated within the December 1 to January 7 period were

deleted, even if that deletion activity occurred at a later time. *See id.* ("ACE anticipates that it

will instruct the expert to search for texts from the specific time period identified in the Motion

(December 1, 2023 – January 7, 2024), and to identify any available information about deletion

of any texts – in response to counsel's allegation about 'clearing space' on the phone."). That

deletion information is likewise ordered produced.

Second, the Missing Texts, *if* they can be retrieved, will fall within the scope of the

messages ordered to be produced in connection with the forensic examination, and so by

ordering that examination the court effectively grants ACE's request that Rubesne be compelled

to produce the Missing Texts. *See* ECF No. 56 at 17.

Third, the court anticipates that the forensic download should encompass the messages

Rubesne already has produced. *See* ECF No. 56-11. However, the court cannot confirm that *all*

retrievable texts within the December 1, 2023, to January 7, 2024 timeframe have been obtained

by Rubesne and produced, and so the forensic examination will proceed with the

acknowledgment that at least some previously-produced messages will be produced again.

Furthermore, a great number of the messages already produced to ACE were provided in

redacted form, for which this court has found no support in a proper invocation of an applicable

privilege. Consistent with that conclusion, and cognizant of the fact that Rubesne currently has

access to the messages it has redacted, the court finds no justification for delaying ACE's access

to that information. The court therefore orders that Rubesne proceed to produce those messages

to ACE in unredacted form within twenty-one days of the date of this Order, even if the same

19

messages are subsequently extracted and produced as a result of the forensic evaluation.

In conclusion, to facilitate the forensic examination, within twenty-one days of the date of this Order counsel for the parties shall cooperate to arrange for the transmission of Ms. Rubesne's cellular phone to a forensic examiner selected by ACE. Rubesne shall provide all information needed to access the data on the cellular phone. This transmission, and the handling of all information contained on the device, **shall be subject to the terms of the Joint Protective Order**. ECF No. 48. Upon completion of the examination and download pursuant to this Order, ACE shall ensure that the device is expeditiously returned to Rubesne. ACE shall further ensure that all extracted messages for the authorized period between December 1, 2023, and January 7, 2024, any deletion information related to those messages, and any report or analysis produced by the examiner, is provided to Rubesne.

ACE shall bear all costs associated with the forensic examination at this time. However, re-allocation of those costs, or the potential imposition of other sanctions, may be addressed in a renewed motion by ACE if subsequent evidence shows that spoliation of electronically-stored information has occurred. *See Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1226 n.7 (10th Cir. 2017) ("[W]here a party acts with the intent to deprive another from using the [electronically-stored information] in litigation, a court may 'presume that the lost information is unfavorable to the party,' issue an adverse-inference instruction, or 'dismiss the action or enter a default judgment.'") (quoting Fed. R. Civ. P. 37(e)(2)(A)-(C)). At this juncture, however, ACE's request for spoliation sanctions is premature.[7] *See* ECF No. 56 at 17 (asserting that, "in light of the

---

[7] The court likewise declines at this time to allow ACE to conduct a limited-scope deposition of Ms. Rubesne to inquire about her alleged "destruction of evidence[.]" ECF No. 65 at 2 n.1. ACE

apparent spoliation of evidence by Plaintiff and its representatives," ACE is "entitled to, at minimum, an adverse inference jury instruction on the content of the messages as implicating Plaintiff's representatives in causation of the subject fire—if not outright dismissal of this case").

## II.      Rubesne's Prior Forensic Examination of Ms. Rubesne's Cellular Phone

The court closes by addressing Rubesne's forensic download of Ms. Rubesne's device. As ACE describes the situation, it first learned of this "unannounced forensic download by an unnamed individual" at the discovery hearing before the undersigned on July 3, 2025. ECF No. 65 at 2 (noting that "ACE has been unable to question that individual"). ACE (and its forensic expert) are entitled to be informed of the particulars of an examination that purportedly exposed the Missing Texts and that might have impacted the device.

To address these evidentiary gaps, the court finds good cause to allow ACE to conduct a deposition of Rubesne's forensic examiner, **limited to three hours of on-the-record time**. The court will not set a deadline for this deposition but directs the parties to conduct a good-faith conferral concerning scheduling. In advance of the deposition, the parties shall also confer regarding the production to ACE of the Rubesne examiner's report and supporting materials, if such information exists and to the extent it has not already been provided to ACE. **All other discovery in this matter shall remain stayed**. ECF No. 50 (finding good cause to enter a temporary stay of discovery in this case pending resolution of the motions to compel).

---

may raise this request again after the completion of its forensic examination of the phone, if appropriate.

**CONCLUSION**

Consistent with the foregoing analysis, Defendant ACE Property and Casualty Insurance Company's Motion to Compel Discovery (ECF No. 56) is **GRANTED in part**. It is respectfully **ORDERED** that

1.      A forensic examination by ACE of Ms. Rubesne's cellular phone shall proceed on the terms set forth above. It is further **ORDERED** that

2.      Rubesne shall produce to ACE in unredacted form the redacted messages referenced in ECF No. 56-11 **within twenty-one days** of the date of this Order. It is further **ORDERED** that

3.      ACE shall be allowed to conduct a **three-hour** deposition of Rubesne's forensic examiner, following production to ACE of documentation related to that examination, as discussed in this Order. It is further **ORDERED** that

4.      All other discovery in this matter shall remain stayed. It is further **ORDERED** that

5.      ACE's request for spoliation sanctions pursuant to Federal Rule of Civil Procedure 37(e)(2) is **DENIED without prejudice**.[8]

---

[8] Rule 72 of the Federal Rules of Civil Procedure provides that within fourteen (14) days after service of a Magistrate Judge's order or recommendation, any party may serve and file written objections with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. §§ 636(b)(1)(A), (B); Fed. R. Civ. P. 72(a), (b). Failure to make any such objection will result in a waiver of the right to appeal the Magistrate Judge's order or recommendation. *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 783 (10th Cir. 2021) (firm waiver rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1119, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require

DATED: May 7, 2026                    BY THE COURT:

_____
Susan Prose
United States Magistrate Judge

---

review, including when a "pro se litigant has not been informed of the time period for objecting and the consequences of failing to object").